# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### ABERDEEN DIVISION

RONALD MOORE,                                                          PLAINTIFFS
INTOUCH ENTERPRISES, LLC, and
CAROL MOORE CARVER

V.                                                          NO. 1:15-CV-13-DMB-DAS

MISSISSIPPI GAMING COMMISSION;
JOHN HAIRSTON, officially and in his
individual capacity; NOLEN CANON,
officially and in his individual capacity;
WALLY CARTER, officially and in his
individual capacity; ALLEN GODFREY,
officially and in his individual capacity;
LYN CHAMBERS, officially and in his
individual capacity; EDWARD WILLIAMS,
officially and in his individual capacity;
LAKEITA F. ROX-LOVE, officially and in
her individual capacity; LEE COUNTY,
MISSISSIPPI; LEE COUNTY SHERIFF
JIM H. JOHNSON, in his official capacity;
and OTHER UNKNOWN JOHN AND
JANE DOES A-Z, also in their individual
and official capacity                                                          DEFENDANTS

## OPINION AND ORDER

Before the Court is: (1) the "Motion to Dismiss for Lack of Subject Matter Jurisdiction and

Failure to State a Claim" filed by the Mississippi Gaming Commission, John Hairston, Nolen Canon,

Wally Carter, Allen Godfrey, Lyn Chambers, and Edward Williams (collectively, "Gaming

Commission Defendants"), Doc. #42; (2) the "Motion to Dismiss for Lack of Subject Matter

Jurisdiction and Failure to State a Claim" filed by Lakeita F. Rox-Love, Doc. #44; and (3)

"Plaintiffs' Motion to Strike and Exclude Defendants' Affidavit and Other Matters Outside of the

Pleadings in its Motion to Dismiss [42]," Doc. #51. For the reasons below, the motion to strike will

be denied, the Gaming Commission Defendants' motion to dismiss will be granted in part, and Rox-Love's motion to dismiss will be granted.

# I
## Factual Allegations and Procedural Background

In September of 2007, Ronald Moore and his daughter, Carol Moore Carver, operated the Paradise Isle Internet Café in West Point, Mississippi.  Doc. #37 at ¶ 20.  On September 12 of that year, "the Gaming Commission Defendants, through their agents, served a search warrant on the Paradise Isle Internet Café, seizing forty (40) computers, a computer server and a digital recorder," claiming that they were "illegal gaming machines."[1]  *Id.*  Moore was subsequently charged with "thirty-nine (39) counts of violation of Section 75-76-55(1)(a) of the Mississippi Code of 1972." *Id.* at ¶ 21.  Although the charges were later dismissed on October 18, 2007, the Gaming Commission Defendants did not return the property seized in the raid.  *Id.*

After the 2007 raid, Moore and Carver made several changes to their equipment.  *Id.* at ¶ 22. Notwithstanding the changes, the Gaming Commission Defendants raided the Paradise Isle Internet Café again on July 20, 2012, seizing more computers and equipment under a warrant referencing an exhibit with a list of "underlying circumstances" but refusing Moore's request to provide such list. *Id.* at ¶ 23; *id.* at Ex. A.  As with the 2007 raid, the Gaming Commission Defendants did not return property seized in the 2012 raid, although they did not pursue criminal charges against Moore or Carver.  *Id.*  Paradise Isle Internet Café closed for several months "[a]s a result of the money and other property taken" during the 2012 raid.  *Id.* at ¶ 24.

A little over a year later, in December of 2013, Moore and Carver re-opened their business under a new name, Intouch Enterprises, LLC.  *Id.* at ¶ 25.  On December 5, 2013, "the Gaming

---

[1] The Mississippi Gaming Commission, created by the Mississippi Legislature, is composed of three commissioners, who must be citizens of the United States and residents of Mississippi.  Miss. Code Ann. § 75-76-7.  With the advice and consent of the Senate, the Commission selects an executive director.  *Id.* § 75-76-15.  The Commission, together with its executive director, issues gaming licenses, adopts gaming regulations, prescribes, assesses, and collects certain fees, and investigates criminal violations of Mississippi's Gaming Control Act.  *Id.* §§ 75-76-33, 75-76-27, 75-76-29.

Commission Defendants … once again raided the premises of the Plaintiffs, and immediately began seizing and boxing up the Plaintiffs' computers, cash, and other equipment." *Id.* Moore and Carver again were not charged with a crime, and the Gaming Commission Defendants again did not return the seized property. *Id.* The plaintiffs allege that in "local news articles," agents of the Commission said the raid was "precipitated" by calls from persons "savvy with the law."[2] *Id.*

Nearly ten months later, on September 23, 2014,[3] the Gaming Commission Defendants and Rox-Love obtained an indictment of Moore on five counts, including gambling violations. *Id.* at Ex. C. Thereafter, in an alleged attempt to pressure Moore, Lee County, Mississippi, and its Sheriff, Jim H. Johnson, obtained an indictment of Carver. *Id.* at ¶ 27. The indictment was signed by Rox-Love. *Id.* On February 3, 2015, Rox-Love moved to dismiss the second indictment of Moore. *Id.* at Ex. D. The day before, Rox-Love obtained a third indictment of Moore on five counts, including gambling violations. Doc. #54 at Ex. A.

On January 15, 2015, Moore and Intouch Enterprises, LLC, filed suit in the United States District Court for the Northern District of Mississippi against the Commission; the other Gaming Commission Defendants, in their individual and official capacities; and "John and Jane Does A-Z," invoking federal question and supplemental jurisdiction. Doc. #1. They alleged six causes of action: (1) deprivation of civil rights under 42 U.S.C. § 1983; (2) conspiracy to interfere with civil rights under 42 U.S.C. § 1985; (3) failure to train adequately and to supervise employees; (4) civil conspiracy; (5) intentional infliction of emotional distress; and (6) conversion. *Id.* On February 20, 2015, before any named defendant answered the complaint, Moore, Intouch Enterprises, and Carver filed an amended complaint, adding as defendants Rox-Love (collectively, with the Gaming

---

[2] The plaintiffs allege that on August 11, 2014, the Gaming Commission Defendants executed a "defective search warrant," sworn by Lyn Chambers, on the "wrong premises," seizing property from Moore's "legitimate business." Doc. #37 at ¶ 27 & Ex. A and Ex. B.

[3] The Second Amended Complaint states that Moore was indicted on August 23, 2014, Doc. #37 at ¶ 18; but the attached indictment reflects that it was filed and recorded on September 23, 2014, *id.* at Ex. C.

Commission Defendants, "State Defendants"); Lee County, Mississippi, and Lee County Sheriff Jim H. Johnson, in his official capacity only (collectively, "County Defendants"); and also adding claims for libel and invasion of privacy. Doc. #13.

The individual State Defendants answered the amended complaint in their individual capacities on March 10, 2015, asserting, among other defenses, prosecutorial immunity, immunity under the Mississippi Tort Claims Act, and Eleventh Amendment immunity. Doc. #16. The same day, the State Defendants jointly moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting, among other things, Eleventh Amendment immunity on behalf of the State Defendants and prosecutorial immunity on behalf of Rox-Love. Doc. #17. In view of the immunity defenses, on March 12, 2015, United States Magistrate Judge David A. Sanders stayed all "conferences, disclosure requirements, discovery, and proceedings … other than additional immunity motion practice" pending the Court's ruling on the motion to dismiss. Doc. #19. The County Defendants answered the amended complaint on March 19, 2015. Doc. #22.

On November 2, 2015, the Court dismissed the plaintiffs' amended complaint as a shotgun pleading, denied the motion to dismiss as moot, and allowed the plaintiffs until November 16, 2015, to file a second amended complaint. Doc. #36. On November 16, 2015, the plaintiffs filed a second amended complaint, asserting the same counts and naming the same defendants as those in the first amended complaint. Doc. #37. The State Defendants and County Defendants filed separate answers on December 21, 2015. Doc. #46; Doc. #47.

Also on December 21, 2015, the Gaming Commission Defendants and Rox-Love filed separate motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), again asserting Eleventh Amendment immunity and the plaintiffs' failure to state a claim for invasion of privacy. Doc. #42; Doc. #44. In addition, Rox-Love asserted prosecutorial immunity, qualified

immunity, and immunity under the Mississippi Tort Claims Act, as well as the plaintiffs' failure to state a claim for libel. Doc. #45 at 2, 21–23. On January 6, 2016, Magistrate Judge Sanders again stayed all "conferences, disclosure requirements, discovery, and proceedings … other than additional immunity motion practice" pending the Court's ruling on the motions to dismiss asserting immunity defenses. Doc. #50.

The next day, on January 7, 2016, the plaintiffs filed a "Motion to Strike and Exclude Defendants' Affidavit and Other Matters Outside of the Pleadings in its Motion to Dismiss [42]," requesting in the alternative jurisdictional discovery. Doc. #51. Also that day, the plaintiffs responded in opposition to the motions to dismiss. Doc. #52; Doc. #54. On January 14, 2016, the State Defendants replied in support. Doc. #56; Doc. #57. On January 21, 2016, the Gaming Commission Defendants responded in opposition to the plaintiffs' motion to strike or for jurisdictional discovery. Doc. #59.

## II
## Standards

### A. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, the complaint "does not need detailed factual allegations," but it must provide the plaintiff's grounds for entitlement to relief—including factual allegations that, when assumed to be true, "raise a right to relief above the speculative level."

*Taylor v. Shreveport*, 798 F.3d 276, 279 (5th Cir. 2015) (citation omitted). Non-jurisdictional immunity, such as qualified or prosecutorial immunity, may be asserted through a Rule 12(b)(6) motion. *Loupe v. O'Bannon*, 824 F.3d 534, 536 (5th Cir. 2016).

### B. Rule 12(b)(1)

A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction over a case. Fed. R. Civ. P. 12(b)(1). In ruling on such a motion, a court may base its ruling on:

(1) the complaint alone;

(2) the complaint supplemented by undisputed facts evidenced in the record; or
(3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

*Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015). Eleventh Amendment immunity may be asserted through a Rule 12(b)(1) motion. *Warnock v. Pecos Cty.*, 88 F.3d 341, 343 (5th Cir. 1996).

### III
### Plaintiffs' Motion to Strike or for Jurisdictional Discovery

The plaintiffs' motion to strike seeks to preclude the Court's consideration of an affidavit and budget document filed as, respectively, Exhibits C and D to the Gaming Commission Defendants' motion to dismiss in support of their Eleventh Amendment immunity defense. Doc. #51 at 2, 4. In the alternative, the plaintiffs seek "limited discovery regarding the contents and statements in the matters outside of the pleadings submitted by the State Defendants" along with a "stay" of the Court's ruling on the Gaming Commission Defendants' motion to dismiss. *Id.* at 4.

### A.  Motion to Strike

In its Eleventh Amendment analysis below, the Court did not consider Exhibits C and D of the Gaming Commission Defendants' motion to dismiss, which relate to whether the Gaming Commission is funded from Mississippi's general fund. Instead, as explained below, the Court's analysis on this point is confined to statute and precedent. *See, e.g.*, *Tradigrain, Inc. v. Miss. State Port Auth.*, 701 F.2d 1131, 1133 (5th Cir. 1983) (determining whether entity is arm of state from enabling statute). Accordingly, the plaintiffs' motion to strike in that regard will be denied as moot.

### B.  Alternative Request for Jurisdictional Discovery

The Eleventh Amendment confers immunity from suit, which includes "avoiding the costs and general consequences" of subjecting nonconsenting States and their arms to the "risks of discovery and trial." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 143–45 (1993) ("[T]he value to the States of their Eleventh Amendment immunity, like the benefit

conferred by qualified immunity to individual officials, is for the most part lost as litigation proceeds past motion practice.").  As such, permitting jurisdictional discovery into an Eleventh Amendment defense before ruling on a pending motion to dismiss asserting that defense "without some reason related to the disposition of the motion" denies "the State's right to have an early determination of its claim of immunity."  *Smith v. Reagan*, 841 F.2d 28, 31 (2d Cir. 1988).

"A plaintiff seeking to overcome" a defense of immunity to suit "must plead specific facts that … allow the court to draw the reasonable inference that … defeat[s]" the defense.  *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (regarding qualified immunity); *see Fontenot v. Texas*, No. 93-8567, 1994 WL 733504, at *3 & n.3 (5th Cir. Dec. 28, 1994) (affirming ruling on Eleventh Amendment immunity defense before completion of discovery because "no discovery was necessary").  Only "*[a]fter* the district court finds a plaintiff has so pled, if the court remains 'unable to rule on the immunity defense without further clarification of the facts,'" it may issue a "narrowly tailored" discovery order.  *Backe*, 691 F.3d at 648 (emphasis in original); *see Wicks v. Miss. State Emp't Svcs.*, 41 F.3d 991, 994 (5th Cir. 1995) ("Discovery … must not proceed until the district court first finds that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity.").

As for the plaintiffs' request for "limited discovery regarding the contents and statements in the matters outside of the pleadings submitted by the State Defendants," the Second Amended Complaint alleges no facts that, if true, would alter the Court's conclusion which, being based on statute and precedent, is a matter of law requiring no "clarification of the facts."  This deficiency precludes jurisdictional discovery; thus, no stay to conduct such is warranted.

# IV
## Gaming Commission Defendants' Motion to Dismiss

The Gaming Commission Defendants argue that the claims against the Commission and the individual Gaming Commission Defendants sued in their official capacities are barred by immunity extended by the Eleventh Amendment. They further argue that the plaintiffs' invasion of privacy claim is not cognizable.

### A. Eleventh Amendment Immunity

An assertion of Eleventh Amendment immunity must be addressed before the merits of a complaint. *Tex. Tech*, 171 F.3d at 285–87. Under the Eleventh Amendment of the United States Constitution:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of Subjects of a Foreign State.

U.S. Const. amend. XI. This immunity includes "suits by citizens against their own States" and guarantees that "nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). Eleventh Amendment immunity extends not only to the States themselves but to those political entities that are "arms of the state." *N. Ins. Co. of N.Y. v. Chatham Cty.*, 547 U.S. 189, 193 (2006). This immunity also protects "state actors in their official capacities." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010); *McCarthy v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004). The "impetus" of this protection is "the prevention of federal-court judgments that must be paid out of a State's treasury." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994). Its "preeminent purpose," however, is to "accord States the dignity that is consistent with their status as sovereign entities." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002). The burden of production is on the political entity asserting

that it is cloaked under the State's Eleventh Amendment immunity as an arm of the state. *Skelton v. Camp*, 234 F.3d 292, 297 (5th Cir. 2000).

The reach of the Eleventh Amendment is subject to three exceptions. The first two are consent to suit in federal court by the State, and valid abrogation of Eleventh Amendment immunity by the United States Congress. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55 (1996). Additionally, under the *Ex Parte Young* doctrine, "a federal court … may enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337 (1979). To evaluate whether the *Ex Parte Young* doctrine avoids an Eleventh Amendment bar to suit, the Court "need only conduct a 'straightforward inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 636 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in judgment)).

Although the burden of production in asserting arm-of-the-state status is on the political entity asserting Eleventh Amendment immunity, when that immunity is asserted under a Rule 12(b)(1) motion, the burden is on the party asserting an exception to the reach of the Eleventh Amendment to persuade the Court that it applies. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction.").

Here, the Gaming Commission Defendants argue that the Commission is an arm of the state and, therefore, that it and the individual Gaming Commission Defendants sued in their official capacities are cloaked under the Eleventh Amendment immunity of the State of Mississippi. They

further argue that none of the exceptions to the reach of the Eleventh Amendment apply and that, as a result, dismissal is required.

### 1. Arm of the State

The Fifth Circuit appears to have not yet decided whether the Commission is an arm of the state. Where the Fifth Circuit has not already determined whether a political entity is an arm of the state, "the matter is determined by reasoned judgment about whether the lawsuit is one which, despite the presence of a state agency as the nominal defendant, is effectively against the sovereign state." *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 689 (5th Cir. 2002) (quoting *Earles v. State Bd. of Certified Pub. Accountants of La.*, 139 F.3d 1033, 1037 (5th Cir. 1998)). In making this determination, the Fifth Circuit, in *Clark v. Tarrant County*, 798 F.2d 736, 744–45 (5th Cir. 1986), set forth six factors that must be considered:

(1) Whether state statutes and case law characterize the agency as an arm of the state;
(2) The source of funds for the entity;
(3) The degree of local autonomy the entity enjoys;
(4) Whether the entity is concerned primarily with local, as opposed to statewide, problems;
(5) Whether the entity has authority to sue and be sued in its own name; and
(6) Whether the entity has the right to hold and use property.

*Delahoussaye v. New Iberia*, 937 F.2d 144, 147 (5th Cir. 1991). Of these six factors, the second—source of funds—is the weightiest. *Vogt*, 294 F.3d at 693; *U.S. ex rel. Barron v. Deloitte & Touche, L.L.P.*, 381 F.3d 438, 440 (5th Cir. 2004). The fourth and fifth factors—authority to sue and be sued, and the right to hold and use property—"weigh significantly less in the six factor balance of equities." *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 281 (5th Cir. 2002).

#### a. Characterization by state law

The first factor asks whether state statutes and state case law "view" the Commission as an arm of the state. *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326–27 (5th Cir. 2002). The

Commission is a state agency as defined by Miss. Code Ann. § 25-9-107(d).[4] An agency defined under that statute is the "principal administrative organization of state government" under the Mississippi Executive Reorganization Act of 1989. Miss. Code Ann. § 7-17-11(a). The legislatively-declared intent of the Reorganization Act of 1989 is to provide the "[g]overnor and the executive branch … full authority to execute the laws … and to administer and manage the affairs of state government …." *Id.* § 7-17-3. A political entity being defined by state law as a state agency, combined with that entity being a part of the executive branch of state government, supports the conclusion that state law characterizes the entity as an "arm of the state." *Earles*, 139 F.3d at 1037; *Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183, 186 (5th Cir. 1986). This factor weighs in favor of arm-of-the-state status for the Commission.

### b. Source of funds

The source of a political entity's funds is determined by two inquiries:

> In assessing this second factor, we conduct inquiries into, first and most importantly, the state's liability in the event there is a judgment against the defendant, and second, the state liability for the defendant's general debts and obligations.

*Vogt*, 294 F.3d at 693 (quoting *Hudson v. City of New Orleans*, 174 F.3d 677, 687 (5th Cir. 1999)). The first step concerns legal, not financial liability—although assessing whether a money judgment is enforceable against the State is "of considerable importance." *Regents of the Univ. of Ca. v. Doe*, 519 U.S. 425, 430–31 (1997). Accordingly, "[t]he state's liability for a judgment is often measurable by a state's statutes regarding indemnification and assumption of debts." *Vogt*, 294 F.3d at 693.

With regard to the first inquiry, the State's liability for judgment, weighing against immunity is that the Commission is obligated by statute to prescribe, assess, and collect sufficient

---

[4] Miss. Code Ann. § 25-9-107(d) states that "'Agency' means any state … commission … created by the Constitution or statutes if such … or the head thereof … is authorized to appoint subordinate staff by the Constitution or statute, except a legislative … commission …." The Commission's executive director may "[e]mploy the services of such persons as he considers necessary …." Miss. Code Ann. § 75-76-21(1)(d).

"investigative" fees, reasonably related to the "actual costs" of investigating applicants,[5] so as to avoid the need for any "state general funds." Miss. Code Ann. §§ 75-76-33(2)(f), (g), (g)(ii). To this end, the Commission is required by statute to:

> Prescrib[e] the amounts of investigative fees only as authorized by regulations of the commission under paragraph (f) of [Subsection 2], and collect[] those fees. The commission shall adopt regulations setting the amounts of those fees at levels that will provide the commission with sufficient revenue, when combined with any other monies as may be deposited into the Mississippi Gaming Commission Fund created in Section 75-76-325, to carry out the provisions of [Chapter 76] without any state general funds.

*Id.* § 75-76-33(2)(g).[6]

That a political entity is funded solely by fees it collects, together with statutes "prohibit[ing] the [entity] from resorting to state coffers for funding," support the conclusion that the source of funds factor weighs against arm-of-the-state status.[7] *Earles*, 139 F.3d at 1038; *see Jacintoport Corp. v. Greater Baton Rouge Port Comm'n*, 762 F.2d 435, 441, 444 (5th Cir. 1985) ("We find of great importance … two particular findings," one of which being that "a judgment against the [entity] … will not affect the state treasury" because "the most favorable estimation" of "monetary damages does not reach a tenth of the [entity's] surplus").

---

[5] "Applicant" is defined as:

> any person who has applied for or is about to apply for a state gaming license, registration or finding of suitability under the provisions of [Chapter 76] or approval of any act or transaction for which approval is required or permitted under the provisions of [Chapter 76].

Miss. Code Ann. § 75-76-5(a).

[6] The Mississippi Legislature abolished the Mississippi Gaming Commission Fund effective July 1, 2016. Miss. Budget Transparency and Simplification Act of 2016, § 3, 2016 Miss. Adv. Leg. Svc. 2362, at *3 (LexisNexis), 2016 Miss. Laws Ch. 459 (West) (uncodified in relevant part).

[7] The plaintiffs allege upon information and belief in their Second Amended Complaint that the Gaming Commission Defendants obtained indemnification insurance "through the [C]ommission" using funds "collected from the industry." Doc. #37 at 2 n.1. The plaintiffs do not mention this allegation in their opposition to the Gaming Commission Defendants' motion to dismiss. Nevertheless, non-state indemnification of a state agency does not affect the Eleventh Amendment analysis. *See Regents of the Univ. of Ca. v. Doe*, 519 U.S. 425, 431 (1997) ("Surely, if the sovereign State of California should buy insurance to protect itself against potential tort liability to pedestrians stumbling on the steps of the State Capitol, it would not cease to be 'one of the United States.'"); *Cronen v. Tex. Dept. of Human Svcs.*, 977 F.2d 934, 938 (5th Cir. 1992) ("[T]he source of the damages is irrelevant when the suit is against the state itself or a state agency" and not covered by *Ex Parte Young*).

Weighing in favor of immunity is that the Commission may spend the funds it collects only upon appropriation by the Mississippi Legislature. Miss. Code Ann. §§ 75-76-325(2), (3); *id.* § 75-76-33(4). *See Voisin's*, 799 F.2d at 186–87 (funding factor weighed in favor of immunity, although some funds collected by entity would be dedicated to its own use, because all funds must be legislatively appropriated to be spent). Also weighing in favor of immunity is that the Commission's expenses are paid out of funds held in an account within the State Treasury. Miss. Code Ann. §§ 75-76-325(2), (3); *c.f. Earles*, 139 F.3d at 1038 (weighing source of funds factor against immunity where "[t]he compensation of board members and all other necessary expense incurred by the board … shall be paid out of the treasury *of the board*.") (quoting La. Admin. Code tit. 46, § XIX.903 (Sept. 1997)) (emphasis added).

Though less important, "[t]he next step is to determine whether the state will indirectly fund a judgment" against the Commission because the State "either is responsible for general debts and obligations or provides the lion's share" of the Commission's budget. *Vogt*, 294 F.3d at 693; *see Hudson*, 174 F.3d at 687. As explained above, relevant statutes show that the Commission is fee funded and that, therefore, the State does not provide the lion's share (or any share) of the Commission's budget. Furthermore, the Gaming Commission Defendants have submitted no evidence as to whether the State is responsible for the general debts and obligations of the Commission's budget. They have, therefore, failed to meet their burden of production as to the source of funds factor.

In sum, one point weighs the source of funds factor against immunity; two weigh in its favor. However, the Gaming Commission Defendants failed to meet their burden with respect to the source of funds factor in asserting arm-of-the-state status. In light of this balance, and without evidence of whether the State of Mississippi is responsible for the general debts and obligations of the

Commission,[8] the Court concludes that the source of funds factor weighs neither for nor against arm-of-the-state status.

### c. Degree of local autonomy

This factor involves determining whether a political entity exercises "local autonomy" or whether it is "primarily controlled by the state." *Perez*, 307 F.3d at 329–30. With regard to a commission, "the determination of an [entity's] autonomy requires analysis of the 'extent of the [entity's] independent management authority' … [as well as] the independence of the individual commissioners" who govern the entity. *Vogt*, 294 F.3d at 694 (quoting *Jacintoport*, 762 F.2d at 442)) (second and third alterations in original).

Weighing against immunity as to this factor are three points. First, the Commission makes rules and licenses persons within a regulated industry. *See, e.g.*, *Earles*, 139 F.3d at 1038 ("The Board exercises considerable authority independent of the state. The Board has the power to '[a]dopt and enforce rules and regulations … as the board may deem necessary and proper to regulate the practice of public accounting in Louisiana.'") (quoting La. Rev. Stat. Ann. § 37:75(B)(2) (West 1988)) (second alternation in original).

Second, the commissioners, who must be Mississippi residents, serve fixed terms. *See Vogt*, 294 F.3d at 695 ("residency requirements … [and] fixed terms" support "finding of local autonomy") (citing *Pendergrass v. Greater New Orleans Expressway Comm'n*, 144 F.3d 342, 347 (5th Cir. 1998)).

---

[8] It remains unclear whether, should the Commission be unwilling to pay a judgment against it, the judgment would be assessable against the State of Mississippi. The Gaming Commission Defendants cite two statutes providing that "[a]ll costs of administration incurred … on behalf of the [C]ommission shall be paid out of claims from the State Treasurer … in the same manner as other claims against the state are paid." Doc. #43 at 13 (citing Miss. Code Ann. §§ 75-76-11(3), 75-76-21(2)). But, as it was when the Gaming Commission Defendants cited these same statutes in their reply in support of their first motion to dismiss, Doc. #34 at 5, "it is unclear whether the appropriate statutes concerning indemnification and assumption of debts are referenced." Doc. #36 at 6 n.5.

Third, the executive director exercises broad management authority and the Commission exercises broad rulemaking authority. *Compare Jacintoport*, 762 F.2d at 442 ("[T]he [c]ommission has great latitude to enter into contracts to negotiate sales and to formulate and execute policy without additional approval.") *with* Miss. Code Ann. § 75-76-21(1)(c), (f) ("The executive director … may … [m]ake, execute and effectuate any and all agreements or contracts … [and] [p]erform such other duties which he may deem necessary ….") *and* Miss. Code Ann. § 75-76-33(1) ("The [C]ommission shall … adopt, amend or repeal such regulations … as it may deem necessary or desirable in the public interest in carrying out the policy and provisions of this chapter.").

Weighing in favor of immunity is that the commissioners are appointed by the governor. *See, e.g.*, *Earles*, 139 F.3d at 1039 (appointment by governor militated against immunity). In sum, three points weigh this factor against immunity; one weighs it in favor. Accordingly, this factor weighs against arm-of-the-state status.

### d. *Concern for primarily local problems*

"This factor properly centers on whether the entity acts for the benefit and welfare of the state as a whole or for the special advantage of local inhabitants." *Vogt*, 294 F.3d at 695 (quoting *Williams v. Dallas Area Rapid Transit*, 242 F.3d 315, 321 (5th Cir. 2001)) (internal quotation marks omitted); *see McDonald v. Bd. of Miss. Levee Comm'rs*, 832 F.2d 901, 908 (5th Cir. 1987) (inquiring into entity's "immediate and primary concern"). The plaintiffs concede that the Commission is concerned with statewide problems. Doc. #53 at 13. The "immediate and primary concern" of the Commission is to regulate gaming through the entire State of Mississippi. *Compare Earles*, 139 F.3d at 1038 ("The Board is concerned with regulating the practice of public accounting on a statewide, rather than local, scale.") *with* Miss. Code Ann. § 75-76-3(1) ("All legal gaming which is conducted

in [Mississippi] … shall be regulated and licensed pursuant to the provisions of this chapter, unless … provide[d] otherwise."). This factor thus weighs in favor of arm-of-the-state status.

### e. Whether Commission may sue and be sued, and hold or use property

The final two factors require consideration of whether the Commission may sue and be sued "in [its] own name[]" and whether it may hold and use property. *Perez*, 307 F.3d at 331. The Gaming Commission Defendants concede that, under Miss. Code Ann. §§ 75-76-21(1)(a) and (b), the Commission, through its executive director, is authorized "to sue and be sued … and [to] acquire real property … on behalf of the [C]ommission." Doc. #43 at 15. The Commission's power to acquire real property is restricted, however, as it may be exercised only "in accordance with statutory procedure." Miss. Code Ann. § 75-76-21(1)(b). The Commission, through its executive director, may also "[a]cquire such furnishings, equipment, … and all other things as he may deem necessary or desirable." *Id.* § 75-76-21(1)(e). This power is also restricted, however, because it may be exercised only in "carrying out [the executive director's] functions." *Id.* All of these authorities are further restricted in that they may be exercised only "in pursuit of the attainment of the objectives and the purposes" of the Gaming Control Act. *Id.* § 75-76-21(1). The restrictions on these authorities counsel giving the last two factors "little effect" in the instant arm-of-the-state analysis. *See, e.g.*, *Hudson*, 174 F.3d at 691 (concluding fact that entity's power to acquire property was "subject to the property control laws" of state to counsel giving "little effect" to property factor).

### f. Analysis

The first and fourth factors—characterization by state law and concern for statewide problems—weigh in favor of arm-of-the-state status. The third factor—local autonomy—weighs against arm-of-the-state status. The second factor—source of funds—weighs neither for nor against arm-of-the-state status. The fourth and fifth factors have little effect in the analysis here.

Because the source of funds factor is the most important of the six *Clark* factors, an analogous case is one in which, as here, that factor does not weigh in favor of immunity. The factors weighing in favor of immunity in *Earles* are the same as in this case. *Earles*, in which the Fifth Circuit held as a "close one" that the Board of Certified Public Accountants of Louisiana was an arm of the state, is therefore the best guide from precedent for purposes of this case.

Two differences between this case and *Earles* suggest that the Commission in this case, however slightly, is an even better candidate for arm-of-the-state status than the Board in *Earles*. These differences concern the most important factor—the source of funds. First, the Board's funds in *Earles* came from a fund outside the State Treasury whereas here, the Commission's funds come from an account within the State Treasury. Second, here, the Commission's spending requires a legislative appropriation, suggesting that the funds the Commission spends are in at least *one* sense the State's funds. In *Earles*, there was no finding that the Board required legislative appropriation to spend.

In sum, though not quite on all fours with *Earles*, this case is sufficiently analogous to *Earles* such that it should produce the same holding. The Court concludes that the Commission is an arm of the state. The next step then is to evaluate whether any exceptions to the reach of the Eleventh Amendment apply.

### 2. Exceptions

Upon review, none of the exceptions to the reach of the Eleventh Amendment apply in this case. The parties do not contest that Mississippi has not consented to this suit being brought in federal court. *See* Miss. Code Ann. § 11-46-5(4) (reserving Eleventh Amendment immunity). As the parties also do not contest, neither 42 U.S.C. §§ 1983 nor 1985, the grounds for the plaintiffs' only two federal claims, abrogate Eleventh Amendment immunity. *Quern v. Jordan*, 440 U.S. 332, 340

(1979); *Price v. Shorty*, 632 Fed. App'x 211, 212 (5th Cir. 2016); *Early v. S. Univ. & Agr. & Mech. Coll. Bd. of Supervisors*, 252 F. App'x 698, 700 (5th Cir. 2007).

As for the last exception to Eleventh Amendment immunity, in order for *Ex Parte Young* to apply, the plaintiffs must request prospective relief from an ongoing violation of federal law. Although the Gaming Commission Defendants extensively address *Ex Parte Young* in their brief and assert that the plaintiffs' Second Amended Complaint "seeks monetary rather than prospective relief," Doc. #43 at 18–20, the plaintiffs fail to address *Ex Parte Young* as applied to the Gaming Commission Defendants in any of their filings on the pending motions. This Court, therefore, has no basis to identify what violation of federal law the plaintiffs may be claiming the Gaming Commission Defendants continue to perpetrate, or what prospective relief the plaintiffs would seek as to any such conduct. *See, e.g.*, *Wright v. New Jersey/Dep't of Educ.*, 115 F.Supp.3d 490, 499 (D.N.J. 2015) (generic prayer for relief fails to trigger *Ex Parte Young* because "Plaintiff has failed to specify the type of injunctive relief he seeks … [and, although Plaintiff] alleged … a 'longstanding history' of discriminatory practices[, he] … has not made clear what type of relief would correct future instances of this alleged practice."). Under these circumstances, the Court cannot conclude that, as the parties asserting federal jurisdiction, the plaintiffs have met their burden of persuading the Court that an exception to the reach of the Eleventh Amendment applies to the Gaming Commission Defendants. Accordingly, as to the Gaming Commission Defendants, *Ex Parte Young* does not apply.

### 3. Summary

The Commission is an arm of the state and, with respect to the Gaming Commission Defendants, no exceptions to the reach of the Eleventh Amendment apply. The Gaming Commission

Defendants, therefore, are cloaked under the Eleventh Amendment immunity of the State of Mississippi.[9]

## B. Invasion of Privacy

The Gaming Commission Defendants briefly argue that Count VII of the plaintiffs' Second Amended Complaint—a claim for invasion of privacy—fails to state a cognizable claim for relief because it is brought under a criminal statute, 26 U.S.C. § 7213, which provides no private right of action. Doc. #43 at 20–21. The plaintiffs respond that such mischaracterizes their claim and that they "state that the invasion of privacy action has been brought because the Defendants unlawfully raided … Moore's businesses, have publicly decried his reputation in the community, and have also published his social security number in the public record." Doc. #53 at 15–16. The Gaming Commission Defendants do not apply the elements of any tort for invasion of privacy to the allegations of the plaintiffs' Second Amended Complaint.

In their Second Amended Complaint, the plaintiffs refer to 26 U.S.C. § 7213 in two places and only in passing. Doc. #37 at ¶¶ 27, 58. The actual count at issue, however, is titled "Invasion of Privacy." Under Mississippi law, "the tort of invasion of privacy is comprised of four distinct and separate subtorts," which are:

1. The intentional intrusion upon the solitude or seclusion of another;
2. The appropriation of another's identity for an unpermitted use;
3. The public disclosure of private facts; and
4. Holding another to the public eye in a false light.

*Raddin v. Manchester Educ. Found., Inc.*, 175 So.3d 1243, 1251 (Miss. 2015) (quoting *Plaxico v. Michael*, 735 So.2d 1036, 1039 (Miss. 1999)). Though the plaintiffs do not expressly state under which subtort they bring their invasion of privacy claim, "[f]ederal pleading rules … do not

---

[9] Because the Gaming Commission Defendants are cloaked under Eleventh Amendment immunity, the Court need not address their alternative argument that the Commission and the individual Gaming Commission Defendants in their official capacities are not "persons" under 28 U.S.C. § 1983.

countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S.Ct. 346, 346 (2014). Here, under the invasion of privacy count, the allegations of the plaintiffs' Second Amended Complaint, at most, refer to "disclos[ing] … private information" and "portray[ing] Moore in a false light." Doc. #37 at ¶¶ 58– 59.

### 1.   False Light

The elements of false light under Mississippi law are:  "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  *Cook v. Mardi Gras Casino Corp.*, 697 So.2d 378, 382 (Miss. 1997). Regarding false light and the Gaming Commission Defendants, the plaintiffs' Second Amended Complaint alleges:

> when the Gaming Commission Defendants acted to raid and close the Plaintiff's business and made corresponding statements to the media portraying the Plaintiff as a criminal, they portrayed him in a false light considering the allegations lodged against the Plaintiff are untrue and are known to be untrue by the Gaming Commission Defendants. Such false information has been widely disseminated and has been given much publicity, thereby resulting in damage to the Plaintiff's reputation and livelihood.

Doc. #37 at ¶ 59.  The Second Amended Complaint specifies the referenced "corresponding statements" three paragraphs later, under the count for libel, stating:

> As stated above, the Gaming Commission Defendants also published false statements about the Plaintiffs when they spoke with local news agencies and stated that Plaintiff Moore's raid was precipitated by "calls from the public," apparently from callers that were "savvy with the law" but in the same article went on to say that the Mississippi Gaming Commission "rarely goes in an establishment based off of hearsay."

*Id.* at ¶ 62.

As to the first element, a false light "highly offensive to a reasonable person," the Second Amended Complaint alleges that the "Gaming Commission Defendants … published false statements" that (1) a raid on Moore's business was "precipitated" by calls from those "savvy with the law" but that (2) the Commission "rarely goes in an establishment based off of hearsay." *Id*. As to the second element, acting with knowledge of or reckless disregard of falsity, the Second Amended Complaint states that the allegations "lodged against the Plaintiff [sic] … are known to be untrue by the Gaming Commission Defendants." *See id*. at 3 (alleging that "[t]he legality of the Plaintiff's [business] model was confirmed by Defendant Gaming Commission's expert.").

The plaintiffs' allegations, taken together and assumed to be true—that the Gaming Commission Defendants conducted a raid to investigate criminal allegations "known to be untrue" but publicized information that the raid was conducted based on adequate grounds—raises "above the speculative level" a right to relief under false light.

## 2. Disclosure

The elements of an invasion of privacy claim based on the public disclosure of private facts under Mississippi law are: publicizing a matter "of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Ayles ex rel. Allen v. Allen*, 907 So.2d 300, 306 (Miss. 2005) (quoting *Young v. Jackson*, 572 So.2d 378, 382 (Miss. 1990)).

Regarding disclosure, with respect to the Gaming Commission Defendants, the plaintiffs' Second Amended Complaint alleges:

> Further, … Rox-Love published the Plaintiff's Social Security Number when she had a duty to keep such information private. In publishing his Social Security Number, the Defendants, through Attorney … Rox-Love, disclosed, without any redaction, private information belonging solely to the Plaintiff [that] was not of a public nature.

Doc. #37 at ¶ 58.[10] The Second Amended Complaint alleges only that Rox-Love publicized Moore's

---

[10] The Second Amended Complaint does not expressly define "Defendants," although it begins in the preamble by

social security number, in a motion to dismiss one of the State's indictments against Moore. To the extent that the plaintiffs attempt to allege that the Gaming Commission Defendants were in a conspiracy with Rox-Love to publicize Moore's social security number, as explained below, this allegation would fail the pleading standards of *Twombly* and *Iqbal*.

## C.   Summary

All claims against the Commission and all claims against the individual Gaming Commission Defendants in their official capacities are barred in this federal court by the Eleventh Amendment. Such claims, therefore, will be dismissed for lack of subject matter jurisdiction. As to the individual Gaming Commission Defendants in their individual capacities, the following claims will be allowed to proceed: (1) § 1983 deprivation of rights (Count I); (2) § 1985 conspiracy (Count II); (3) failure to train and supervise (Count III); (4) civil conspiracy (Count IV); (5) intentional infliction of emotional distress (Count V); (6) conversion (Count VI); (7) false light invasion of privacy (Count VII); and (8) libel (Count VIII).[11]

## V
## <u>Rox-Love's Motion to Dismiss</u>

Rox-Love argues that the official capacity claims against her must be dismissed because she is cloaked under the Eleventh Amendment immunity of the State of Mississippi as an employee of the Mississippi Attorney General's office. She also argues that all the federal individual-capacity claims against her must be dismissed because of absolute prosecutorial immunity. Finally, Rox-Love argues that the plaintiffs fail to state a claim against her for libel, that the state law invasion of privacy claim against her is not cognizable, and that all state-law claims against her in her individual capacity are barred by immunity extended to her through the Mississippi Tort Claims Act.

---

referring to the "aforementioned Defendants," presumably meaning all defendants listed in the caption.

[11] Of the claims brought against the Gaming Commission Defendants' in their individual capacities, the Gaming Commission Defendants' motion to dismiss only addressed the invasion of privacy claim.

## A. Eleventh Amendment Immunity

### 1. Arm of the State

The plaintiffs never contest that the Mississippi Attorney General's Office is an arm of the state. Doc. #55 at 7–10. Indeed, the Mississippi Attorney General "is charged with managing all litigation on behalf of the state, except as otherwise specifically provided" and has the "sole power to bring or defend a lawsuit on behalf of a state agency, the subject matter of which is of statewide interest." Miss. Code Ann. § 7-5-1. This authority and relationship to the State is consistent with arm-of-the state status. *See Barry v. Fordice*, 814 F. Supp. 511, 513 (S.D. Miss. 1992), *aff'd mem.*, 8 F.3d 1 (5th Cir. 1993) (claim against Mississippi Attorney General in his official capacity barred by Eleventh Amendment); *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (assuming Texas Attorney General is arm of state); *Okpalobi v. Foster*, 244 F.3d 405, 410–11 (5th Cir. 2001) (assuming Louisiana Attorney General is arm of state). Rox-Love, as an employee of the Mississippi Attorney General's Office, falls within the scope of the State's Eleventh Amendment immunity. *See McGee v. Krebs*, No. 1:15-cv-65-LG-RHW, 2015 WL 7290965, at *6 (S.D. Miss. Nov. 18, 2015) ("The Eleventh Amendment clearly bars … damages claims against … the [Mississippi] Attorney General's office.").

### 2. Exceptions

As mentioned above, the State has not waived its Eleventh Amendment immunity, and neither ground for the plaintiffs' two federal claims abrogate it. As for the remaining exception to Eleventh Amendment immunity, *Ex Parte Young*, Rox-Love argues that it does not apply to the plaintiffs' claims against her. In response, "the Plaintiff [sic] maintains that the relief requested encompasses equitable prospective relief enjoining the disclosure of the Plaintiffs' personal information and to cease the wrongful conduct against the Plaintiffs in violation of the United States Constitution." Doc. #55 at 9.

In order for *Ex Parte Young* to apply, the plaintiffs must request prospective relief from an ongoing violation of federal law. The Second Amended Complaint includes no request for an injunction or declaratory judgment. It does, however, include a generic prayer for "such other relief, general or specific, as the Court may deem appropriate, just and equitable in the premises." Doc. #37 at 29. Courts have sometimes construed such a "boilerplate recitation of 'just and equitable'" relief as a request for prospective relief under *Ex Parte Young*. In those cases, however, the court has had the benefit of material outside of the complaint to confirm the plaintiffs' intention to request prospective relief and to understand the nature of the requested relief. *See, e.g.*, *Frazier v. Simmons*, 254 F.3d 1247, 1254 n.3, 1255 (10th Cir. 2001) (considering pretrial order). *But see Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1526 n.12 (11th Cir. 1994) ("The mere incantation of … boilerplate [language seeking 'just and proper' relief] does not convert a legal cause of action into a legitimate request for equitable relief.").

As to Rox-Love in particular, the plaintiffs do not request relief from an ongoing violation of federal law. The disclosure of personal information by Rox-Love alleged in the Second Amended Complaint occurred in a single court filing. As for any other "wrongful conduct" against the plaintiffs, as noted below, the remaining acts of Rox-Love's cited in the Second Amended Complaint only include obtaining three indictments and moving to dismiss one.[12] None of these allegations are of ongoing conduct. The plaintiffs have not met their burden of persuading the Court that an exception to the reach of the Eleventh Amendment applies to Rox-Love in her official capacity.

---

[12] The plaintiffs do not request an injunction against state criminal proceedings, nor do they respond to Rox-Love's argument that this relief would be foreclosed under the *Younger* and *Heck* abstention doctrines.

### 3. Summary

Rox-Love, as an employee of the Mississippi Attorney General's Office, comes within the scope of the State's Eleventh Amendment immunity, and no exceptions apply. The claims against Rox-Love in her official capacity are, therefore, barred by the Eleventh Amendment.

### B. Prosecutorial Immunity

A prosecutor is absolutely immune from a civil suit for damages under 42 U.S.C. §§ 1983 and 1985 arising out of the prosecutor's performance of certain functions. *Kalina v. Fletcher*, 522 U.S. 118, 125–27 (1997); *Cousin v. Small*, 325 F.3d 627, 635 (5th Cir. 2003). These functions include initiating a criminal case and "carrying [it] through the judicial process." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976); *Boyd v. Biggers*, 31 F.3d 279, 285 (5th Cir. 1994). They also include "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

The plaintiffs particularly refer to alleged conduct of Rox-Love in only four paragraphs throughout their Second Amended Complaint:

(1)     It is believed that [Rox-Love] was *responsible for* the unlawful dissemination of Plaintiff Ronald Moore's Social Security Number in the publicly accessible *Court documents*. Further, it is believed this Defendant failed to *properly [sic] move to dismiss the claims against Plaintiff Ronald Moore* as there was no Certificate of Service attached to said Motion. Moreover, this Defendant failed to notify Plaintiff Moore of the Motion and subsequent Order dismissing all charges against him … until nearly one week later …. Upon information and belief she conspired with the other Defendants to purposefully expose and intentionally cause the Plaintiff to be subjected to identity theft. … She acted outside the scope of her employment purposefully, and knowingly by engaging in the actions set forth above. …

(2)     All of the Defendants including … Rox-Love conspired to violate the Constitutional rights, both under the Mississippi and Federal constitutions, in an effort to deprive the liberties and rights of Plaintiffs …, to destroy Plaintiff Moore's business, to destroy their reputations, and to inflict emotional distress *by charging them criminally* ….

> (3)     [The] *indictment* [of Carver] was signed by … Rox-Love and was, as the
>         Plaintiffs believe, an attempt to put further pressure on Plaintiff Moore.
>         Thereafter … the Gaming Commission Defendants, through Attorney Rox-
>         Love, *moved to dismiss the criminal charges* against Plaintiff Moore and
>         wrongfully included his full, un-redacted Social Security Number on the
>         Motion, thereby infringing upon his right to privacy ….
>
> (4)     … Rox-Love published the Plaintiff's Social Security Number when she had
>         a duty to keep such information private.

Doc. #37 at ¶¶ 13, 26–27, 58 (emphases added).[13]  The Second Amended Complaint makes no

particular reference to Rox-Love other than that quoted above.[14]  All such allegations concern

initiating and carrying through the judicial process the State's case against the plaintiffs.  As such,

Rox-Love is shielded in both her individual and official capacities from the plaintiffs' federal claims

by absolute prosecutorial immunity.[15]  *See, e.g.*, *Brooks v. George Cty.*, 84 F.3d 157, 161, 168 (5th

Cir. 1996) (§ 1983 claim against prosecutor for failure to notify defendant that charges against him

were dismissed, resulting in extra eight months of incarceration, barred by prosecutorial immunity

because "prosecutor's act[] … of requesting that the court enter an order of nolle prosequi … [is]

prosecutorial activit[y] 'intimately associated with the *judicial* phase of the criminal process.'")

(quoting *Imbler*, 424 U.S. at 430) (emphasis in original).

### C.  Mississippi Tort Claims Act Immunity

Rox-Love next argues that state-law claims against her in her individual capacity are barred

by the Mississippi Tort Claims Act, which provides that "no employee [of a governmental entity]

shall be held personally liable for acts or omissions occurring within the course and scope of the

---

[13] The conduct alleged regarding the unredacted social security number presumably was made in the State's motion to
dismiss criminal charges against Moore dated February 3, 2015.  *See* Doc. #37 at Ex. D (including partially redacted
social security number).

[14] The plaintiffs argue in response to Rox-Love's motion to dismiss that Rox-Love "cho[se] to actively cooperate with
and assist law enforcement personnel in their combined ongoing 'investigation'" of the plaintiffs.  Doc. #55 at 16.  Such
allegations simply do not appear in the plaintiffs' Second Amended Complaint.  As for the search warrant attached as an
exhibit to the Second Amended Complaint, the warrant was sworn by Lyn Chambers, not Rox-Love.  Doc. #37 at Ex. A.

[15] Because Rox-Love is entitled to absolute prosecutorial immunity, the Court need not address her alternative argument
that she is also shielded from the plaintiffs' federal claims by qualified immunity.

employee's duties." Miss. Code Ann. § 11-46-7(2). It is a rebuttable presumption that acts "within the time and at the place of [an employee's] employment" are within the scope of her employment. *Id.* § 11-46-7(7). "A plaintiff seeking to overcome" a defense of immunity to suit "must plead specific facts that … allow the court to draw the reasonable inference that … defeat[s]" the defense. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). *See Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 439, 444–45 (5th Cir. 2015) (citing *Backe*, 691 F.3d at 648) (reversing denial of motion for judgment on pleadings, holding because "amended complaint does not adequately allege" that defendant acted outside of discretion, discretionary function immunity under Mississippi Tort Claims Act required dismissal); *Roderick v. City of Gulfport*, 144 F.Supp.2d 622, 638 (S.D. Miss. 2000) (looking to complaint under motion to dismiss standard for allegations of libel and malice for purpose of individual-capacity immunity under Mississippi Tort Claims Act); *Moore v. Carroll Cty.*, 960 F. Supp. 1084, 1091 (N.D. Miss. 1997) (same). *See also Sorey v. Kellett*, 849 F.2d 960, 963 (5th Cir. 1988) (reversing denial of motion to dismiss, concluding in now-longstanding *Erie* guess that pre-Mississippi Tort Claims Act qualified immunity included immunity from individual-capacity suit).

As noted above, the acts the plaintiffs allege Rox-Love committed—initiating and carrying through the judicial process the State's criminal suit against the plaintiffs—are presumably "at the time and place of her employment" as a Special Assistant Attorney General for the Gaming Division of the Mississippi Attorney General's Office. The plaintiffs could overcome the presumption that these acts are within the scope of Rox-Love's employment by "plead[ing] specific facts" that her acts constituted "fraud, malice, libel, slander, defamation or any criminal offense." Miss. Code Ann. § 11-46-7(2). The plaintiffs, however, fail to allege that Rox-Love's acts constituted any of these grounds. *See, e.g.*, *Hearn v. Bd. of Supervisors of Hinds Cty.*, 575 F. App'x 239, 243 (5th Cir. 2014)

("[T]he district court properly concluded that the complaint failed to allege … employees were acting outside the scope of their employment" for purpose of Mississippi Tort Claims Act). *See also Marks v. Dann*, 600 F. App'x 81, 85–87 (4th Cir. 2015) (conclusory allegation of improper purpose failed to allege defendant acted with malice or outside scope of public duties for purpose of Maryland Tort Claims Act); *Richman v. Sheahan*, 270 F.3d 430, 442 (7th Cir. 2001) ("[I]f there are no allegations that the defendant was acting for a purpose unrelated to his employment, the fact that the conduct was willful and wanton does not take the conduct outside the defendant's scope of agency for purposes of sovereign immunity" from state-law claims).

In their Second Amended Complaint, the plaintiffs include a count of libel and invasion of privacy and allege that "all Defendants" acted to further a malicious conspiracy to "inflict emotional distress" and to "subject[] [Moore] to identity theft." As to libel and invasion of privacy, however, the plaintiffs fail to allege that Rox-Love made any false statement or publically disclosed any false matter.[16] As to a malicious conspiracy, the plaintiffs fail to plead to the standards of *Twombly* and *Iqbal* that Rox-Love engaged in one. Instead, the plaintiffs' allegations of Rox-Love's acts in the Second Amended Complaint—obtaining three indictments and moving to dismiss one—are "just as consistent with lawful conduct" as they are with a malicious conspiracy. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (state-law claims for conspiracy and malicious prosecution failed standards of *Twombly* and *Iqbal* because "the behavior … alleged … is just as consistent with lawful conduct as it is with wrongdoing.").

In particular, including Moore's social security number in the motion to dismiss criminal charges against him is just as consistent with mistake as it is with conspiracy.[17] Merely alleging that

---

[16] "[E]ssential to both a false light privacy claim and a defamation claim is a determination that 'the matter published concerning the plaintiff is not true.'" *Prescott v. Bay St. Louis Newspapers, Inc.*, 497 So.2d 77, 80 (Miss. 1986) (quoting Restatement (Second) of Torts § 652E, cmt. a (Am. Law Inst. 1977)).

[17] Moore's social security number was also included in the order of dismissal issued by the state circuit judge. Doc. #37

these acts are in furtherance of a conspiracy without "plead[ing] specific facts" to support the "reasonable inference" that they are fails to allege a conspiracy under both the Rule 12(b)(6) standard and the notice requirement of Rule 8. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (conspiracy allegations "placed in a context … [must raise] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."); *Jabary v. Allen*, 547 F. App'x 600, 610–11 (5th Cir. 2013) (mere allegation that "[defendants] actively conspired with each other to destroy [plaintiff's] civil rights" and that "there were several conversations, private meetings, and other communications that took place to further [defendants'] conspiracy" failed *Twombly* and *Iqbal* standard) (internal quotation marks omitted).

### D.  Summary

All claims against Rox-Love in her official capacity are barred in federal court by the Eleventh Amendment and, therefore, will be dismissed for lack of subject matter jurisdiction.  All federal claims against Rox-Love are barred by absolute prosecutorial immunity and, therefore, will also be dismissed.  All state-law claims against Rox-Love in her individual capacity are barred by immunity under the Mississippi Tort Claims Act and, therefore, will be dismissed.[18]

### VI
### Conclusion

For the reasons above:

1.     The Gaming Commission Defendants' motion to dismiss [42] is **GRANTED in Part and DENIED in Part**.  It is GRANTED to the extent it seeks dismissal of the claims against the Commission; the claims against the Gaming Commission Defendants in their official capacities; and the invasion of privacy claim based on disclosure brought against the Gaming Commission

---

at Ex. D.  The plaintiffs do not allege that the state circuit judge is part of a conspiracy.

[18] Because all remaining state law claims against Rox-Love are dismissed under the Mississippi Tort Claims Act, the Court need not address Rox-Love's arguments that the plaintiffs fail to state a claim for libel and invasion of privacy.

Defendants in their individual capacities. It is DENIED to the extent it seeks dismissal of the invasion of privacy claim based on false light.[19]

    2.      Rox-Love's motion to dismiss [44] is **GRANTED**.

    3.      The plaintiffs' motion to strike [51] is **DENIED**.

    4.      All claims against the Mississippi Gaming Commission, the individual Gaming Commission Defendants in their official capacities, and Rox-Love in her official capacity are **DISMISSED** for lack of subject matter jurisdiction. All remaining claims against Rox-Love are **DISMISSED**.

    **SO ORDERED**, this 29th day of September, 2016.

                    **/s/ Debra M. Brown**
                    **UNITED STATES DISTRICT JUDGE**

---

[19] Accordingly, the invasion of privacy claim based on false light and the plaintiffs' other claims against the Gaming Commission Defendants in their individual capacities listed above in Section IV(C) will proceed